NON-CONFIDENTIAL VERSION

2012-1695, 2013-1020

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

UNITED STATES STEEL CORPORATION,

Plaintiff-Appellant,

and

ARCELORMITTAL USA, LLC,

Plaintiff,

and

NUCOR CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

COMPANHIA SIDERURGICA NACIONAL,

Defendant-Appellee,

and

NIPPON STEEL CORPORATION, JFE STEEL CORPORATION,
KOBE STEEL, LTD., NISSHIN STEEL CO., LTD.,
and SUMITOMO METAL INDUSTRIES, LTD.,

Defendants-Appellees.

Appeal from the United States Court of International Trade in consolidated case no. 11-CV-0228, Senior Judge Nicholas Tsoucalas.

## BRIEF OF PLAINTIFF-APPELLANT
## UNITED STATES STEEL CORPORATION

/s/ James C. Hecht
Robert E. Lighthizer
James C. Hecht
Stephen P. Vaughn
Stephen J. Narkin

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7370
Facsimile: (202) 661-9080
E-Mail: InternationalTrade@skadden.com

*Counsel for Plaintiff-Appellant*
*United States Steel Corporation*

December 18, 2012

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

UNITED STATES STEEL CORPORATION V US

2012-1695, 2013-1020

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant, United States Steel Corporation, certifies the following:

1.      The full name of every party or amicus represented by me is:

United States Steel Corporation

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.      ☒      There is no such corporation as listed in paragraph 3.

5.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Skadden, Arps, Slate, Meagher & Flom LLP: Robert E. Lighthizer, James C. Hecht, Jeffrey D. Gerrish, Stephen P. Vaughn, Stephen J. Narkin.

| _12/18/12_ | _/s/ James C. Hecht_ |
|---|---|
| Date | Signature of Pro Se or Counsel |
| | Skadden, Arps, Slate, Meagher |
| | & Flom LLP |
| | 1440 New York Avenue, N.W. |
| | Washington, D.C. 20005 |
| | Telephone: (202) 371-7370 |
| | Facsimile: (202) 661-9080 |
| | E-Mail: InternationalTrade@skadden.com |
| | |
| | James C. Hecht |
| | Printed name of counsel |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... ii

STATEMENT OF RELATED CASES ...................................1

JURISDICTIONAL STATEMENT .........................................1

STATEMENT OF THE ISSUES PRESENTED........................1

STATEMENT OF THE CASE...............................................2

STATEMENT OF FACTS ........................................................6

SUMMARY OF THE ARGUMENT ....................................11

ARGUMENT ....................................................................14

    I.     STANDARD OF REVIEW ................................................14

    II.    THE COMMISSION'S FINDING THAT INCREASED
          IMPORTS FROM JAPAN ARE NOT LIKELY IS
          UNLAWFUL BECAUSE THE COMMISSION
          IMPROPERLY ASSUMED THAT THE JAPANESE
          PRODUCERS WOULD BE ABLE TO INCREASE THEIR
          EXPORTS TO EXISTING CUSTOMERS .......................17

    III.   THE COMMISSION'S VULNERABILITY ANALYSIS IS
          UNLAWFUL BECAUSE IT DID NOT RECOGNIZE THAT
          WEAK DEMAND ARGUED IN FAVOR OF A FINDING
          THAT THE DOMESTIC INDUSTRY WAS VULNERABLE.........22

    IV.   CONCLUSION ...............................................................31

CONFIDENTIAL MATERIAL OMITTED

    The confidential material omitted on pages 11, 13, 20-21, 27-28, and 30 relates to certain trade publications that are available by subscription only, and which were treated as business proprietary information in the proceedings below.  The confidential material omitted on pages 18-19 relates to detailed information regarding other parties' business activities, which was treated as business proprietary information in the proceedings below.

# TABLE OF AUTHORITIES

## CASES

*Allegheny Ludlum Corp. v. United States,* 287 F.3d 1365 (Fed. Cir. 2002) .........14

*Atlantic Sugar v. United States*, 744 F.2d 1556 (Fed. Cir. 1984).........................15

*Altx, Inc. v. United States*, 167 F.Supp.2d 1353, 1359 (Ct. Int'l Trade 2001).......16

*Burlington Truck Lines v. United States,* 371 U.S. 156 (1962)............................16

*Consol. Edison Co. v. NRLB,* 305 U.S. 197 (1938)..............................................14

*Consolidated Fibers, Inc. v. United States,* 571 F. Supp. 2d 1355 (Ct. Int'l Trade 2008)..................................................................................................23

*Suramerica de Aleaciones Lamindas, C.A. v. United States,* 44 F.3d 978 (Fed. Cir. 1994) ...................................................................................15

*Universal Camera Corp. v. NRLB*, 340 U.S. 474 (1951) ......................................14

*United States v. Nova Scotia Food Prods.,* 568 F.2d 240 (2d. Cir. 1977) ............16

## STATUTES

19 U.S.C. § 1516a(a) (2006)...................................................................................1

19 U.S.C. § 1675a(a) (2006)..................................................................................23

19 U.S.C. § 1675(c) (2006)......................................................................................6

19 U.S.C. § 1677f(i) (2006) ...................................................................................16

28 U.S.C. § 1581(c) (2006)......................................................................................1

29 U.S.C. § 1295(a) (2006)......................................................................................1

## OTHER AUTHORITIES

*Barium Chloride from China,* USITC Pub. 4157, Inv. No. 731-TA-149
(Third Review) (June 2010)..............................................................26

*Certain Ammonium Nitrate from Ukraine*, USITC Pub. 3924, Inv. No. 731-
TA-894 (Review) (June 2007)..........................................................26

*Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil,*
67 Fed. Reg. 11093 (Dep't Commerce March 12, 2002) (order) ......................4

*Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil,*
64 Fed. Reg. 38797 (Dep't Commerce July 19, 1999) (susp. of
investigation) ................................................................................3

*Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil,
Japan, and Russia,* USITC Pub. 3767, Inv. Nos. 701-TA-384 and 731-
TA-806-808 (Review) (Apr. 2005) ...................................................4

*Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan,*
64 Fed. Reg. 34778 (Dep't Commerce June 29, 1999) (order) .......................3

*Certain Hot-Rolled Steel Products from Japan*, 64 Fed. Reg. 33514 (Int'l
Trade Comm'n June 23, 1999) (final determ.) ..................................3

*Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil*, 64 Fed.
Reg. 38792 (Dep't Commerce July 19, 1999) (susp. of investigation) .............3

*Hot-Rolled Flat-Rolled Carbon-Quality Steel From Brazil,* 69 Fed. Reg.
56040 (Dep't Commerce Sept. 17, 2004) (termination of susp.
agreement) ..................................................................................4

*Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan,
and Russia,* 75 Fed. Reg. 16504 (Int'l Trade Comm'n Apr. 1, 2010)...............5

*Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan,
and Russia,* USITC Pub. 4237, Inv. Nos. 701-TA-384 and 731-TA-
806-808 (Second Review) (June 2011) ...........................................5

*Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia,* 76 Fed. Reg. 34101 (Int'l Trade Comm'n June 10, 2011) (determ.)..........................................................................................................5

*Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Japan,* 64 Fed. Reg. 24329 (Dep't Commerce May 6, 1999) (final determ.) ...................3

*Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From the Russian Federation*, 64 Fed. Reg. 38642 (Dep't Commerce July 19, 1999) (susp. of investigation) ...............................................................................................3

Statement of Administrative Actions Accompanying the Uruguay Round Agreement Act, H.R. Rep. No. 103-316 (1994) at 885, *reprinted in* 1994 U.S.C.C.A.N. 4040 ........................................................................ 23-24

## STATEMENT OF RELATED CASES

To the best of the knowledge of United States Steel Corporation ("U. S. Steel"), there are no related cases.

## JURISDICTIONAL STATEMENT

This is an appeal from the decision of the U.S. Court of International Trade (the "Court below" or the "CIT") in *United States Steel Corporation v. United States*, Slip Op. 12-108 (Ct. Int'l Trade 2012), entered on August 14, 2012. [1] The CIT exercised jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2006). The notice of the appeal by U. S. Steel was filed on October 9, 2012, and this appeal is, therefore, timely under Federal Circuit Rule 4. This Court has jurisdiction under 29 U.S.C. § 1295(a)(5) (2006). This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES PRESENTED

1.  In these five-year reviews of antidumping duty order on imports from Japan, is the finding of the U.S. International Trade Commission ("Commission") that a significant increase in imports of hot-rolled steel flat products ("hot-rolled steel") is not likely supported by substantial evidence and otherwise in accordance

---

[1]  *United States Steel Corporation v. United States,* No. 11-228, Slip Op. 12-108 (Ct. Int'l Trade Aug. 14, 2012) ("Court Op."), *published at* 856 F.Supp.2d 1318 (Ct. Int'l Trade 2012), Joint Appendix ("JA") 1.

1

with law when the Commission assumed that the Japanese producers would be able to increase their exports to certain Asian customers with whom they had established long-term relationships even though the Commission did not perform a proper analysis of that question?

2.    In these five-year reviews of antidumping duty orders on imports from Brazil and Japan, is the finding of the Commission that the domestic industry producing hot-rolled steel is not vulnerable to material injury supported by substantial evidence and otherwise in accordance with law when the Commission failed properly to take into account the fact that the industry has experienced a steep, structural decline in demand when considering whether the industry is in a weakened state?

## STATEMENT OF THE CASE

On September 30, 1998, domestic producers of hot-rolled steel filed antidumping ("AD") and countervailing duty ("CVD") petitions with the U.S. Department of Commerce ("the Department") and the Commission alleging that a domestic industry was materially injured or threatened with material injury by reason of unfairly-traded imports of hot-rolled steel from Brazil, Japan, and Russia. The petitions alleged that imports of hot-rolled steel from Brazil were subsidized and dumped and that imports from Japan and Russia were dumped.

On May 6, 1999, the Department made an affirmative antidumping

determination for Japan.[2]  On June 18, 1999, the Commission made a final

affirmative determination that imports from Japan caused material injury to the

domestic industry producing hot-rolled steel.[3]  On June 29, 1999, the Department

issued an antidumping order on imports from Japan.[4]  In July 1999, the

Department signed suspension agreements with the governments of Brazil and

Russia covering imports of hot-rolled steel from those countries[5]  The Department

subsequently found that Brazil had breached the terms of the suspension agreement

applicable to the AD investigation of imports from that country.  As a result, in

2002 the Department terminated the suspension agreement and imposed an AD

---

[2]  *Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Japan* , 64 Fed.
    Reg. 24329 (Dep't Commerce May 6, 1999) (final determ.).

[3]  *Certain Hot-Rolled Steel Products From Japan* , 64 Fed. Reg. 33514 (Int'l Trade
    Comm'n June 23, 1999) (final determ.).

[4]  *Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Japan* , 64
    Fed. Reg. 34778 (Dep't Commerce June 29, 1999) (order).

[5]  *Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil* , 64 Fed.
    Reg. 38792 (Dep't Commerce July 19, 1999) (susp. of investigation);  *Certain
    Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil* , 64 Fed.
    Reg. 38797 (Dep't Commerce July 19, 1999) (susp. of investigation);  *Hot-
    Rolled Flat-Rolled Carbon-Quality Steel Products From the Russian
    Federation*, 64 Fed. Reg. 38642 (Dep't Commerce July 19, 1999) (susp. of
    investigation).

order on imports of hot-rolled steel from Brazil.[6]  In 2004, at the request of the Government of Brazil, the suspension agreement applicable to the CVD investigation of Brazilian imports was terminated by the Department and was replaced by a CVD order on such imports.[7]

In 2005, the Commission completed its initial five-year reviews of the trade relief in effect for Brazil, Japan, and Russia.  The Commission made affirmative determinations for imports from all three countries.[8]

On April 1, 2010, the Commission gave notice, pursuant to 19 U.S.C. § 1675(c) (2006), that it had instituted the five-year reviews that are at issue in this case to determine whether revocation of the AD and CVD orders on hot-rolled steel from Brazil and Japan and termination of the suspension agreement with Russia would likely lead to the continuation or recurrence of material injury to the

---

[6]    *Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil*, 67 Fed. Reg. 11093 (Dep't Commerce March 12, 2002) (order).

[7]    *Hot-Rolled Flat-Rolled Carbon-Quality Steel From Brazil*, 69 Fed. Reg. 56040 (Dep't Commerce Sept. 17, 2004) (termination of susp. agreement).

[8]    *Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia,* USITC Pub. 3767, Inv. Nos. 701-TA-384 and 731-TA-806-808 (Review) (Apr. 2005) at 3, JA 1914.

domestic industry producing that product. [9] U. S. Steel, a domestic producer of hot-rolled steel, actively participated in all stages of these reviews.

On May 19, 2011, the Commission voted in these reviews. The Commission unanimously reached affirmative determinations with respect to the suspension agreement with Russia. By a vote of 2 to 4, the Commission reached negative determinations with respect to the orders on imports of hot-rolled steel from Brazil and Japan. [10]

The Commission's determinations were published in the *Federal Register* on June 10, 2011. [11] On July 6, 2011, U. S. Steel commenced an appeal of the Commission's negative determinations for Brazil and Japan by the timely filing and service of a Summons with the CIT within the thirty-day statutory time limit specified by 19 U.S.C. § 1516a(a)(2)(A) (2006). On August 4, 2011, U. S. Steel filed a Complaint within the thirty-day statutory time limit specified in 19 U.S.C. § 1516a(a)(2)(A) (2006). On September 26, 2011, the Court below granted a

---

[9]   *Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia*, 75 Fed. Reg. 16504 (Int'l Trade Comm'n Apr. 1, 2010), JA 2172-2175.

[10]   *Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia*, USITC Pub. 4237, Inv. Nos. 701-TA-384 and 731-TA-806-808 (Second Review) (June 2011) ("Review Determ.") at 3, JA 39.

[11]   *Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia,* 76 Fed. Reg. 34101 (Int'l Trade Comm'n June 10, 2011) (determ.), JA 276.

consent motion for the consolidation of U. S. Steel's appeal of the Commission's negative determinations for Brazil and Japan with an appeal of the Commission's negative determinations for Brazil and Japan that was separately filed by Nucor Corporation ("Nucor").

On August 14, 2012, the Court below issued an opinion affirming the Commission's negative determinations. [12] U. S. Steel timely filed a notice of the appeal of this decision on October 9, 2012.

## STATEMENT OF FACTS

This appeal concerns the revocation of antidumping and/or countervailing duty orders against imports of hot-rolled steel from Brazil and Japan that resulted from affirmative injury determinations that were made by the Commission in 1999. In 1999, the Commission also made an affirmative injury determination in its antidumping investigation of imports of hot-rolled steel from Russia.

In 2004, the Commission initiated five-year reviews under 19 U.S.C. § 1675(c) to determine whether the termination of trade relief against unfairly-traded imports from Brazil, Japan, and Russia would likely cause the continuation or recurrence of material injury to the domestic industry producing hot-rolled steel. In

---

[12]  Court Op.,  *published at* 856 F.Supp.2d 1318 (Ct. Int'l Trade 2012), JA 1-28.

2005, the Commission cumulated imports from Brazil, Japan, and Russia, and made affirmative determinations for all three of these countries.

The Commission initiated the reviews that are the subject of this appeal on April 1, 2010.  In these reviews, four of the six members of the Commission did not cumulate imports from any of the three countries subject to review. Accordingly, these commissioners considered whether termination of trade relief for each country, viewed individually, would likely cause the continuation or recurrence of material injury to the domestic industry.  These commissioners made an affirmative determination for imports from Russia, but negative determinations for imports from Brazil and Japan.

Two of the six members of the Commission cumulated imports from all three countries subject to review.  These commissioners made affirmative determinations for all three countries.  Accordingly, the Commission made a unanimous affirmative determination for imports from Russia.  By a 2-4 vote, however, the Commission made negative determinations for imports from Brazil and Japan.

U. S. Steel appealed the Commission's negative determinations for imports from Brazil and Japan to the CIT.  Domestic producers Nucor and ArcelorMittal also appealed these negative determinations to the CIT.

U. S. Steel, Nucor, and ArcelorMittal challenged the Commission's negative determinations on a number of grounds. The Court below rejected the arguments made by these domestic producers and affirmed the Commission's negative determinations for Brazil and Japan.

In its appeal to this Court, U. S. Steel challenges two aspects of the decision of the Court below. Accordingly, U. S. Steel will discuss here only those facts that are pertinent to those two issues.

In making a negative determination for imports from Japan, the Commission found that imports from Japan would not be likely to increase significantly if the order on imports from that country were revoked. The Commission made this finding despite the fact that, as it conceded, the Japanese producers "have the ability to increase exports." [13] As the Commission pointed out, the Japanese industry's reported excess capacity in 2010 exceeded 5.1 million net tons ("NT") – an amount that the Commission characterized as "a substantial quantity." [14] The Commission also acknowledged that "{t}he industry in Japan has a substantial export orientation" – which the Commission found "is likely to continue," given

---

[13] Review Determ. at 40, JA 76.

[14] *Id.* at 40-41, JA 76-77.

that consumption of hot-rolled steel in Japan was expected to be lower in 2011 and 2012 than it was in 2010. [15]

But the Commission nevertheless found that a significant increase in imports from Japan was not likely because Japanese exports during the period of review ("POR") had been consistently focused on Asian markets, these exports had increased, and the Commission believed that this trend of increasing exports to Asian markets would continue. [16] In finding that the trend of increasing exports to Asian markets by the Japanese producers would continue, the Commission relied to a significant extent on the fact that the Japanese producers have significant long-term relationships with customers in their Asian export markets. [17] The Commission stated that the Japanese producers would likely focus on maintaining and increasing their supplies to these customers. [18]

The Commission also found that neither imports from Brazil nor imports from Japan would have a significant adverse impact on the domestic industry if the orders on imports from those countries were revoked. [19] Under the statute, as part

---

[15] *Id.* at 41, JA 77.

[16] *Id.* at 41 & n.257, JA 77.

[17] *Id.* at 41, JA 77.

[18] *Id.* at 42, JA 78.

[19] *Id.* at 40 and 45, JA 76 and JA 81.

of its analysis of the impact of the revocation of an AD order on the domestic

industry, the Commission is required to consider whether the industry is

"vulnerable" to material injury, *i.e.*, is in "a weakened state."  The Commission

found that the domestic hot-rolled steel industry is not vulnerable to material

injury.[20]  The Commission reached that conclusion notwithstanding the fact that

the industry's production, shipments, and employment all declined significantly

over the POR[21] and notwithstanding the fact that the industry's financial

performance was, in the Commission's word, "lackluster." [22]

The Commission discounted the significance of the domestic industry's poor

financial performance.  The Commission stated that the industry's financial

performance in 2010 was not "unduly poor in light of that year's apparent

consumption, which was below levels of 13 of the 14 previous years." [23]  The

Commission also said that "some improvement in U.S. demand is likely in 2011

and 2012."[24]

---

[20]  *Id.* at 35, JA 71.

[21]  *Id.* at C-3, JA 265.

[22]  *Id.* at 35, JA 71

[23]  *Id.*

[24]  *Id.*

# SUMMARY OF THE ARGUMENT

This appeal concerns the Commission's analysis of two critical issues.  U. S. Steel does not ask this Court to reweigh the record evidence relating to these issues. Instead, U. S. Steel requests this Court to recognize that the Commission made two egregious and undeniable mistakes that were critical to the disposition of the issues that were before it and to remand this case to the Commission with instructions to reconsider its negative determinations for Brazil and Japan after those errors are rectified.

First, in analyzing the likelihood that imports from Japan would increase significantly if the order on imports of hot-rolled steel from that country were revoked, the Commission acknowledged that the Japanese producers had substantial excess capacity and that these producers were export-oriented.  Other evidence on the record showed that Japan's already large excess capacity was

[                                              ]

Yet the Commission found that the Japanese producers would not increase their exports to this country because they would instead focus on increasing their exports to customers in other Asian markets with whom they had long-standing relationships.  However, the record contains no substantial evidence showing that Japanese mills could increase sales to such customers in the future.  U. S. Steel pointed this out to the Commission and asked the Commission to evaluate

carefully what the record showed about future exports by Japanese producers to these customers.  But the Commission failed to do so.  Consequently, the Commission did not address an argument of cogent materiality advanced by U. S. Steel, in clear violation of its legal obligation to address such arguments. U. S. Steel made this argument to the Court below, but the Court's opinion does not discuss it.

Second, in evaluating the likely impact on a domestic industry of the revocation of an AD or CVD order, the Commission is required by statute to consider whether the industry is "vulnerable" to material injury.  The Commission found that the domestic hot-rolled steel industry is not vulnerable based on an indefensible analysis of demand conditions facing the domestic industry.

The Commission acknowledged that various indicators of the industry's performance, including the industry's production, shipments, and employment, declined over the POR.  The Commission also acknowledged that the industry's financial performance was "lackluster."  However, the Commission stated that the industry's financial performance was not "unduly poor," given that the industry was facing weak demand.  In so doing, the Commission treated one indication that the industry was vulnerable ( *i.e.*, weak demand) as somehow offsetting another indication that the industry was vulnerable ( *i.e.*, its poor financial performance). Such an analysis simply is not rational.

Furthermore, to the extent that the Commission believed that the industry's financial performance was not an indication that the industry was vulnerable because it merely reflected what one might expect to see at the bottom of the business cycle, there is no substantial evidence to support such a finding and overwhelming evidence that refutes it. Specifically, the data that the Commission collected showed that over the period from 1998 to 2010 apparent domestic consumption of hot-rolled steel in this country demand reached lower and lower highs at the top of the business cycles during that period and deeper and deeper lows at the bottom of the business cycles during that period, with the net result being a decline in demand of 20 million NT over that period.

In rejecting U. S. Steel's argument on this issue, the Court below stated that the evidence indicated that the decline in demand that the industry experienced was cyclical rather than structural. However, the data that were before the Commission constitutes unmistakably clear evidence that the industry was in the midst of a steep structural decline in demand.

Finally, the Commission pointed to some evidence, in the form of a [                                      ] that demand would improve somewhat in 2011 and 2012. The Court below also cited this evidence. However, in the response brief that the Commission submitted to the Court below, it characterized this anticipated increase as [          ] In fact, this projected improvement,

coming off an extremely depressed base in demand, could not possibly have changed the fact that the industry was vulnerable to material injury because demand was extremely depressed and its financial industry was poor.  The Court below erred when it found otherwise.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews the CIT's evaluation of the Commission's determinations "by stepping into the shoes {of the CIT} and duplicating its review, evaluating whether Commission determinations are unsupported by substantial evidence or otherwise not in accordance with law." [25]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [26]

The U.S. Supreme Court has made clear that the "substantial evidence" test must be applied in a manner that is not overly deferential.  In *Universal Camera Corp. v. NRLB*, 340 U.S. 474, 481 (1951), the Court noted that many lower courts had interpreted this test as requiring a "myopic view of the record," stating:

---

[25]  *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1369 (Fed. Cir. 2002) (citation omitted).

[26]  *Consol. Edison Co. v. NRLB*, 305 U.S. 197, 299 (1938).

> Under a "prevalent" interpretation of the "substantial evidence" rule, if what is called "substantial evidence" is found anywhere in the record to support conclusions of fact, the courts are said to be obliged to sustain the decision without reference to how heavily the countervailing evidence may preponderate – unless indeed the stage of arbitrary decision is reached.  Under this interpretation, the courts need to read only one side of the case and, if they find any evidence there, the administrative action is to be sustained and the record to the contrary is to be ignored.

The Court firmly rejected that view, emphasizing that "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."[27]  The Court emphasized that an agency determination may not be sustained "merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn."[28]  The U.S. Court of Appeals for the Federal Circuit has made plain that this principle must be applied in determining whether a determination by the Commission meets the substantial evidence test. [29]

Moreover, the statute directs the Commission to "include in a final determination of injury an explanation of the basis for its determination that

---

[27]  *Id.*

[28]  *Id.* at 487.

[29]  *See*, *e.g.*, *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994); *Atlantic Sugar v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (stating that a court must take into account "whatever in the record fairly detracts from . . . {the} weight" of the evidence relied upon by the Commission).

addresses relevant arguments that are made by interested parties who are parties to the investigation or review (as the case may be) concerning volume, price effects, and impact on the industry of imports of the subject merchandise." [30]  Such thorough consideration of such arguments and analyses is "also an integral element of the Commission's responsibility to 'examine the relevant data and articulate a satisfactory explanation for its action'." [31]  "It is not in keeping with the rational {agency} process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered." [32]

Finally, at a minimum, the agency must articulate a "rational connection" between the facts found and the choice made." [33]  This is true even under the "arbitrary and capricious" standard of review – a standard of review that is far more deferential to the agency than the "substantial evidence" test that is applicable here.

---

[30]  19 U.S.C. § 1677f(i)(3)(B) (2006).

[31]  *Altx, Inc. v. United States*, 167 F.Supp.2d 1353, 1359 (Ct. Int'l Trade 2001) (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mu. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

[32]  *United States v. Nova Scotia Food Prods.*, 568 F.2d 240, 252 (2d Cir. 1977).

[33]  *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

II.    **THE COMMISSION'S FINDING THAT INCREASED IMPORTS FROM JAPAN ARE NOT LIKELY IS UNLAWFUL BECAUSE THE COMMISSION IMPROPERLY ASSUMED THAT THE JAPANESE PRODUCERS WOULD BE ABLE TO INCREASE THEIR EXPORTS TO EXISTING CUSTOMERS**

The Commission repeatedly made clear that its conclusion that the Japanese producers would not increase their exports to the United States was based on the Commission's view that these producers could, and would, increase their exports to Asian markets.  According to the Commission, "{t}he size, projected dynamic growth, and proximity to Japan of the Asian market provides a strong incentive for Japanese producers to continue to direct their shipments, as well as any unused capacity, to that market, rather than the smaller and less quickly growing U.S. market."[34]  The Commission added that "the trend in growth of exports to Asia is likely to continue in the reasonably foreseeable future, given the continuing nature of many of the Japanese industry's customer-supplier relationships and projected growth in Asian markets."[35]  The Commission found that "the existence of numerous such long-term arrangements indicates that Japanese producers would

---

[34]   Review Determ. at 41, JA 77.

[35]   *Id.* at 42, JA 78.

likely continue to focus on maintaining and increasing supplies to these customers . . . ."[36]

But there is no substantial evidence to support the Commission's assumption that the Japanese industry would be able to *increase* their exports to these customers.  With [

].[37]  The only [

].[38]

U. S. Steel brought these critical facts to the Commission's attention, [39] but the Commission completely disregarded them.  In finding that the arrangements at

---

[36]  *Id.*

[37]  U. S. Steel Post-Hearing Brief (April 15, 2011) ("U. S. Steel Post-Hearing Br.") at Exhibit 1, pp. 8-9 (APO Version), JA 11544-11545.

[38]  *Id.* at Exhibit 1, p. 8, JA 11544.

[39]  *Id.* at Exhibit 1, pp. 4-13, JA 11540-11549.

issue would create incremental demand for exported Japanese hot-rolled steel, the

Commission simply relied on the fact that the export data for the POR indicated

that these arrangements had done so *in the past*.[40]  This was plain error.  There was

no factual basis in the record to support a finding that these arrangements would

lead to significantly increased Japanese exports to Asia *in the future*.  Because the

Commission failed to take into account the analysis of that issue provided by U. S.

Steel, and performed no meaningful analysis of that important issue on its own

initiative, its finding that these arrangements would result in significantly increased

Japanese exports was sheer speculation.

    As discussed above, the Commission's finding on this issue was critical to its

overall evaluation of the likelihood that exports by Japan would increase

significantly.  Moreover, other probative evidence in the record showed that the

Japanese producers had the ability and the incentive to increase their exports to the

United States.  Japan's excess capacity was already very large – more than five

million NT.[41]  Furthermore, as shown below, other data in the record showed that

[                                                                    ]

---

[40]  *See* Review Determ. at 42, JA 78 (emphasis added).

[41]  Id. at 40-41, JA 76-77.

In various contexts, when analyzing the likelihood of increased exports by

Japan, the Commission [

]42  So there is no question

that the Commission [                                                    ]  But

[      ] projected that 2010 would be the [

].  In fact, [

] MT, and would

[                                    ].43  In other words, [        ] analysis

indicated that Japan's already large excess capacity [                                    ]

Moreover, Japanese [

]  The responding

Japanese producers reported to the Commission that they had 5,169,590 NT of

---

42  *See* Views of the Commission ("Views of the Commission") at 62 (APO
Document), JA 10059 ("{A}ccording to [        ], in 2010 consumption of hot-
rolled steel in East and Southeast Asia was [        ] greater than consumption
in North America."); *Id.* ("[      ] projects that the robust growth in hot-rolled
consumption that occurred in East and Southeast Asia during the period of
review will continue into the reasonably foreseeable future"); *Id.* at 64 n.263,
JA 10061 ("[      ] does not project surplus production in East and Southeast
Asia for 2011 and 2012 in quantities materially exceeding those during the
period of review.").

43  U. S. Steel Post-Hearing Br. at Exhibit 3, p. 86 (APO Version), JA 11616.

excess capacity in 2010, the last year of the POR. [44] [     ] projected that by 2012,

the Japanese hot-rolled industry would have [

  ][45]  Thus, [     ] – an [

  ] – projected that [

  ].  Furthermore, apparent domestic

consumption of hot-rolled steel in the United States in 2010 amounted to

56,090,768 tons.[46]  [

  ].

Hence, the evidence in the record made clear that [

  ]  And, for the reasons discussed above, there is no evidence in

---

[44]  *See* Review Determ. at IV-19, JA 197.  59,163,638 NT – 53,994,048 NT = 5,169,590 NT.

[45]  [

  ], JA 12176 (showing [
  ]; [
  ], JA 12562 (showing [
  ]; [                         ], JA 12185 (projecting
[                                    ]).  *Id.*  This translates into
[

  ].

[46]  Review Determ. at I-7, JA 97.

the record to support a finding that this is likely to be done through an increase in the Japanese producers' exports to existing Asian customers.  In light of these facts, the ITC's analysis cannot be upheld.

The Court below was squarely presented with this argument but nowhere addressed it.  The Court said that the "ITC analyzed Japanese producers' long-term relationships in the region." [47]  However, the Court did not identify any portion of the Commission's determination (or its Staff Report) that explained how these relationships would result in additional exports to Asia *in the future*.  Indeed, it would have been impossible for the Court to have done so.  That is because, although the Commission was explicitly requested by U. S. Steel to perform this essential analysis, it failed to do so.  As a result, its determination cannot be sustained under the applicable standard of review, which requires that an agency address arguments of cogent materiality raised by the parties.

## III.   THE COMMISSION'S VULNERABILITY ANALYSIS IS UNLAWFUL BECAUSE IT DID NOT RECOGNIZE THAT WEAK DEMAND ARGUED IN FAVOR OF A FINDING THAT THE DOMESTIC INDUSTRY WAS VULNERABLE

In making negative determinations for Brazil and Japan, the Commission concluded that revocation of the orders on imports from those countries would not

---

[47]   Court Op. at 17, JA 17.

likely have a significant adverse impact on the domestic industry. [48]   In both cases,

the Commission's conclusion on that issue was made in the context of a finding by

the Commission that the domestic industry was not vulnerable to material injury in

the event of revocation. [49]

Under the Tariff Act of 1930, as amended (the "Act"), in evaluating the

likely impact of subject imports on the domestic industry, the Commission is

required to analyze "whether the industry is vulnerable to material injury if the

order is revoked." [50]   The Statement of Administrative Action Accompanying the

Uruguay Round Agreements Act of 1994 ("SAA") directs the Commission to

determine whether an industry is "vulnerable" within the meaning of the Act by

evaluating whether the industry is in a "weakened state" that renders it susceptible

to the likely effects of subject imports if an order is revoked. [51]   The SAA further

states:

---

[48]   Review Determ. at 40 and 45, JA 76 and JA 81.

[49]   *Id.*

[50]   19 U.S.C. § 1675a(a)(1)(C) (2006).

[51]   Statement of Administrative Actions Accompanying the Uruguay Round
Agreement Act, H.R. Rep. No. 103-316 (1994) ("SAA") at 885, *reprinted in*
1994 U.S.C.C.A.N. 4040, 4210.  *See also Consolidated Fibers, Inc. v. United
States*, 571 F. Supp. 2d 1355, 1365 (Ct. Int'l Trade 2008) (holding that the SAA
"instructs the Commission to consider the weakened condition of the U.S.
industry" when assessing the vulnerability of the industry).

> {I}f the Commission finds that an industry is vulnerable to injury from subject imports, it may determine that injury is likely to continue or recur, even if other causes . . . are likely to contribute to future injury. If the Commission finds that the industry is in a weakened state, it should consider whether the industry will deteriorate further upon revocation of an order. [52]

U. S. Steel argued before the Commission that the domestic industry was vulnerable because demand was weak, as apparent domestic consumption at the end of the POR was nearly 20 million NT below the levels seen before the entry of the orders on imports from Brazil and Japan. [53] The Commission did not – indeed, could not – find that demand was not weak. To the contrary, the Commission specifically stated that apparent consumption in 2010 was below the levels seen in 13 of the 14 previous years. [54] However, instead of concluding that this indisputably weak demand was evidence of the industry's vulnerability, the Commission treated weak demand as *negating* the evidence that the industry's financial performance was poor, stating that it did not regard the industry's financial performance as "unduly poor," given weak demand. [55]

---

[52]   SAA at 885.

[53]   U. S. Steel Pre-Hearing Brief (Mar. 28, 2011) ("U. S. Steel Pre-Hearing Br.") at 17 (Public Version), JA 1221.

[54]   Review Determ. at 35, JA 71.

[55]   *Id.*

U. S. Steel also argued that the domestic industry was vulnerable to material injury because of its weak financial performance. [56] U. S. Steel pointed out that the financial performance of the domestic industry over an extended period of time had not been adequate to attract funds for needed capital investments. [57] U. S. Steel noted that from 1999 to 2010, the industry's average operating margin was only 5.9 percent, whereas in 1999 the interest rate on 10-year U.S. Treasury bonds was 5.65 percent.[58] U. S. Steel also noted that the domestic industry had lost money over the previous two years and that, in 2010, even after the economy had improved, its operating margin was only 1.0 percent. [59]

In short, there were two different types of evidence that the domestic industry was vulnerable to material injury:  evidence of weak demand and evidence of the domestic industry's poor financial performance.  Together, these facts strongly indicated that the domestic industry was in the "weakened state" to which the SAA refers.

Remarkably, however, instead of finding that this evidence supported a finding of vulnerability, the Commission found that the combination of poor

---

[56]  U. S. Steel Pre-Hearing Br. at 14-16 (Public Version), JA 1218-1220.

[57]  *Id.* at 16, JA 1220.

[58]  *Id.* at 14-15, JA 1218-1219.

[59]  *Id.* at 15, JA 1219.

financial performance and weak demand indicated that the domestic industry was

*not* vulnerable.  Specifically, the Commission stated:

> Although we would not characterize the industry's 2010 operating
> performance as robust, neither do we consider it unduly poor in light of that
> year's apparent consumption, which was below levels of 13 of the 14
> previous years.[60]

U. S. Steel argued before the Court below that this finding defies logic.  The

Commission acknowledged two facts – that the domestic industry was facing weak

demand and that its financial performance was poor.  Both facts strongly supported

a finding that the industry was vulnerable.  Yet the Commission treated the

evidence of weak demand as negating the evidence that the financial performance

of the industry was poor.  It is as if the Commission concluded that $1 + 1 = 0$. [61]

---

[60]  Review Determ. at 35, JA 71.

[61]  The Commission's finding also runs completely counter to the manner in which
the Commission has analyzed the significance of weak demand for purposes of
determining whether an industry is vulnerable in other five-year reviews.  For
example, in *Barium Chloride from China*, USITC Pub. 4157, Inv. No. 731-TA-
149 (Third Review) (June 2010), the Commission found that demand had
experienced a "long-term decline" – just as consumption of hot-rolled steel has
declined since the period of the original investigations.  *Id.* at 10.  The
Commission cited the level of demand for barium chloride as a factor that
supported its finding that the domestic industry was vulnerable.  *Id.* at 16.
Similarly, in *Certain Ammonium Nitrate from Ukraine*, USITC Pub. 3924, Inv.
No. 731-TA-894 (Review) (June 2007), the Commission found that demand for
ammonium nitrate had declined over the preceding three years.  *Id.* at 19.  The
Commission cited this "contracting" U.S. demand as one factor supporting its
finding that the domestic industry was vulnerable.

In an effort to bolster its analysis, the Commission stated that "{b}ecause some improvement in U.S. demand is likely in 2011 and 2012, the industry's condition in the reasonably foreseeable future is likely to improve." [62] Thus, the Commission asserted that "in the context of the business cycle, the industry is not vulnerable notwithstanding its lackluster 2010 financial performance." [63]

But the record plainly showed that [

]. The Commission's finding with respect to U.S. demand in 2011 and 2012 rests entirely upon a projection from

[        ].[64] But that projection showed that [

][65] Indeed,

U. S. Steel [

].[66] Moreover, in the brief that the Commission filed with the Court below, the Commission itself stated that it found, based upon

---

[62]  Review Determ. at 35, JA 71.

[63]  *Id.*

[64]  *See* Views of the Commission at 53 n.218 (APO Document), JA 10050 ( *citing* Tables IV-22-23 of the Staff Report).

[65]  *See* Staff Report to the Commission on Investigation Nos. 701-TA-384 and 731-TA-806-808 (Second Review) (May 5, 2011) at IV-44 to IV-45 (APO Version), JA 10260-10261.

[66]  U. S. Steel Post-Hearing Br. at 4 (APO Version), JA 11524.

[          ] projection, that "demand for hot-rolled steel in the United States would likely increase [              ] during 2011 and 2012."[67]

Succinctly stated, then, the record shows that:

- Demand for hot-rolled steel at the end of the POR was nearly 20 million NT lower than it was before the entry of the orders on imports from Brazil and Japan;

- Demand for hot-rolled steel at the end of the POR was so weak that the Commission regarded it as the explanation for the industry's financial performance, which the Commission itself described as lackluster;

- The Commission found that demand would increase [          ] from this abysmal level in 2011 and 2012.

Finally, U. S. Steel submitted extensive evidence "that general economic conditions are not strong and that both the U.S. and world economies face numerous risk factors."[68]  Among other things, U. S. Steel pointed to evidence of the risk of a European debt default, high U.S. unemployment, the depressed housing market, high oil prices, and efforts to address state and local budget deficits as factors likely to weigh on demand for hot-rolled steel going forward. [69]

To the extent that the Commission relied on expectations of stronger demand in 2011 and 2012 to support its vulnerability analysis, it should have explained why

---

[67]  Response Brief of U.S. International Trade Commission (Mar. 6, 2012) at 34 (APO Version), JA 12547 (emphasis added).

[68]  U. S. Steel Pre-Hearing Br. at 21 (Public Version), JA 1225.

[69]  *Id.* at 21-30, JA 1225-1234.

the numerous risk factors identified by U. S. Steel were not likely to harm demand going forward.  But it failed to do so.

The Court below nevertheless sustained the Commission's finding on the basis of a very abbreviated analysis of U. S. Steel's argument.  The Court stated:

> The ITC explained its interpretation that the lackluster performance of the domestic industry reflected demand conditions in the context of the business cycle rather than structural vulnerabilities of the industry itself. [70]

In fact, on the basis of the record that was before the Commission, there was no conceivable basis – let alone substantial evidence – to support a finding that the decline in demand that the domestic industry faced was cyclical, rather than structural.  Over the period from 1998 – the year before the orders were entered – to 2010, apparent domestic consumption of hot-rolled steel in the United States was as follows:[71]

| | |
|---|---|
| 1998: | 75,251,117 NT |
| 1999: | 73,064,292 NT |
| 2000: | 74,000,452 NT |
| 2001: | 63,309,100 NT |
| 2002: | 67,319,017 NT |
| 2003: | 66,794,467 NT |
| 2004: | 73,173,003 NT |
| 2005: | 65,860,369 NT |
| 2006: | 71,625,604 NT |
| 2007: | 63,674,080 NT |

---

[70]  Court Op. at 24, JA 24.

[71]  Review Determ. at I-6 to I-7, JA 96-97.

2008:     59,636,710 NT
2009:     40,402,675 NT
2010:     56,090,768 NT

As these data show, since 1998, demand reached lower and lower highs at the top of the business cycles during that period and deeper and deeper lows at the bottom of the business cycles during that period, and the net result has been a decline in demand of almost 20 million NT over that period.  It is simply not possible to describe such a pattern as anything other than clear proof of a decline in demand that is structural, rather than cyclical.

Finally, the Court also found that there was substantial evidence in the record that "the industry is poised to experience a recovery with projected increases in demand.[72]  However, as discussed above, the Commission itself has characterized the anticipated increase in demand as [          ] Such a [          ] increase in demand from such an abysmal low point would not render the industry significantly less vulnerable to material injury.  Consequently, there was no substantial evidence in the record to support the Commission's vulnerability finding, and the Court below plainly erred when it found otherwise.

---

[72]  Court Op. at 24, JA 24.

## IV.    CONCLUSION

For all of the reasons set out above, U. S. Steel requests this Court to find that the Commission's negative determinations for imports from Brazil and Japan are not supported by substantial evidence and are otherwise not in accordance with law.  U. S. Steel requests this Court to remand this case to the Commission with instructions to the Commission to reconsider its negative determinations after correcting the mistakes that are the subject of this appeal.

Respectfully submitted,

/s/ James C. Hecht
Robert E. Lighthizer
James C. Hecht
Stephen P. Vaughn
Stephen J. Narkin

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7370
Facsimile: (202) 661-9080
E-Mail: InternationalTrade@skadden.com

*Counsel for Plaintiff-Appellant United States Steel Corporation*

December 18, 2012

# ADDENDUM

Slip Op. 12- 108

UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Nicholas Tsoucalas, Senior Judge**

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, | : |
| Plaintiff, | : |
| and | : |
| NUCOR CORPORATION and ARCELORMITTAL USA LLC, | : |
| Plaintiff-Intervenors | : |
| v. | : Consol. Court No. 11-00228 |
| UNITED STATES, | : |
| Defendant, | : |
| and | : |
| COMPANHIA SIDERURGICA NACIONAL, JFE STEEL CORPORATION, KOBE STEEL, LTD., NIPPON STEEL CORPORATION, NISSHIN STEEL CO., LTD., and SUMITOMO METAL INDUSTRIES, LTD., | : |
| Defendant-Intervenors. | : |

[The Plaintiffs' Motions for Judgment on the Agency Record are denied. The United States International Trade Commission's Determination is affirmed. The case is dismissed.]

Dated: August 14, 2012

Skadden, Arps, Slate, Meagher & Flom, LLP, (James C. Hecht, Robert E. Lighthizer, Stephen P. Vaughn, and Stephen J. Narkin) for Plaintiff, United States Steel Corporation.

Wiley Rein, LLP, (Tessa V. Capeloto, Alan H. Price, Timothy C. Brightbill, and Maureen E. Thorson) for Plaintiff-Intervenor, Nucor Corporation.

Kelley Drye and Warren, LLP, (Kathleen W. Cannon, Paul C. Rosenthal, R. Alan Luberda, and Grace W. Kim) for Plaintiff-Intervenor, ArcelorMittal USA LLC.

James M. Lyons, General Counsel; Neal J. Reynolds, Assistant General Counsel; Marc A. Bernstein, Office of the General Counsel, U. S. International Trade Commission; Carrie A. Dunsmore, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, for Defendant, United States.

Hogan Lovells US LLP, (Craig A. Lewis, Jonathan T. Stoel, and Brian S. Janovitz), for Defendant-Intervenor Companhia Siderurgica Nacional.

Gibson, Dunn & Crutcher, LLP, (J. Christopher Wood, Donald Harrison, Andrea Fraser-Reid Farr, Daniel J. Plaine, and DeLisa L. Lay) for Defendant-Intervenors JFE Steel Corporation, Kobe Steel, Ltd., Nippon Steel Corporation, Nisshin Steel Co., Ltd., Sumitomo Metal Industries.


## OPINION

**TSOUCALAS, Senior Judge:** This matter comes before the Court upon the Motions for Judgment on the Agency Record filed by United States Steel Corporation ("U.S. Steel"), Nucor Corporation ("Nucor") and ArcelorMittal USA LLC ("AMUSA") (collectively "Plaintiffs") pursuant to United States Court of International Trade Rule 56.2. Plaintiffs challenge the final determination of the United States International Trade Commission ("ITC") revoking antidumping and countervailing duty orders on hot-rolled flat-rolled steel products from Japan and Brazil. See Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia, 76 Fed. Reg. 34101 (June 10, 2011). Plaintiffs argue that the final sunset determination is not supported by substantial evidence and otherwise not in accord with the law. Plaintiffs seek a remand of this matter for further proceedings before the ITC.

Defendant, United States, and Defendant-Intervenors, Companhia Siderurgica Nacional, JFE Steel Corporation, Kobe Steel, Ltd., Nippon Steel Corporation, Nisshin Steel Co., Ltd. and Sumitomo Metal Industries (collectively "Defendants"), argue that the ITC conducted a proper analysis and that its determination was supported by substantial evidence and in accord with the law. They oppose remand of this matter.

Based on the record and oral arguments held on August 7, 2012, and for the reasons set forth below, the Court finds that the ITC's final determination was supported by substantial evidence and in accord with the law. This matter is dismissed.

JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I).

STANDARD OF REVIEW

The Court is required to "hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence, or otherwise not in accord with the law." 19 U.S.C. §§ 1516a(a)(2)(B)(iii), 1516a(b)(1)(B)(i). However, the decision of the ITC is presumed to be correct and the burden of proving otherwise rests on the party challenging the decision. 28 U.S.C. § 2639(a)(1).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951).

"Substantial evidence requires more than a mere scintilla, but is

satisfied by something less than the weight of the evidence."

Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004)

(internal citations and quotation marks omitted).

As long as there is an "adequate basis in support of the

Commission's choice of evidentiary weight, the Court of

International Trade, and [the Federal Circuit], reviewing under the

substantial evidence standard, must defer to the Commission."

Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed. Cir.

2006). The ITC has the "discretion to make reasonable

interpretations of the evidence and to determine the overall

significance of any particular factor in its analysis." Goss

Graphics Sys., Inc. v. United States, 22 CIT 983, 1008, 33

F.Supp.2d 1082, 1104 (1998), aff'd 216 F.3d 1357 (Fed. Cir. 2000).

"Certain decisions, such as the weight to be assigned a particular

piece of evidence, lie at the core of [the] evaluative process."

U.S. Steel Grp. v. United States, 96 F.3d 1352, 1357 (Fed. Cir.

1996). "[T]he possibility of drawing two different conclusions

does not prevent an administrative agency's finding from being

supported by substantial evidence." Consolo v. Fed. Mar. Comm'n,

383 U.S. 607, 620 (1966). The Court may not "displace the [ITC's]

choice between two fairly conflicting views, even though the court

would justifiably have made a different choice had the matter been

before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Nor may the Court "reweigh the evidence or substitute its own judgment for that of the agency." Usinor v. United States, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004).

The ITC "must address significant arguments and evidence which seriously undermines its reasoning and conclusions." Altx, Inc. v. United States, 25 CIT 1100, 1117-18, 167 F. Supp.2d 1353, 1374 (2001). However, the ITC is not "required to explicitly address every piece of evidence presented by the parties, and . . . is presumed to have considered all of the evidence on the record." Nucor Corp. v. United States, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004), aff'd 414 F.3d 1331 (Fed. Cir. 2005).

## BACKGROUND

Under review are the ITC's negative determinations in the second sunset review of the antidumping and countervailing duty orders on hot-rolled steel imports from Japan and Brazil. Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia, 76 Fed. Reg. 34101 (June 10, 2011).

This matter arose out of the Department of Commerce's ("Commerce") various suspension agreements, antidumping orders, and countervailing duty orders on hot-rolled steel from Brazil, Japan, and Russia. Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 34778 (June 29, 1999); Suspension of Antidumping Duty Investigation: Hot-Rolled Flat-Rolled Carbon-

Quality Steel Products from Brazil, 64 Fed. Reg. 38792 (July 19,
1999); Suspension of Antidumping Duty Investigation: Hot-Rolled
Flat-Rolled Carbon-Quality Steel Products from the Russian
Federation, 64 Fed. Reg. 38642 (July 19, 1999); Certain Hot-Rolled
Steel Products from Brazil and Russia, Inv. Nos. 731-TA-384, 731-
TA-806, 808, USITC Pub. 3223 (Aug. 1999).

    In 2005, the ITC completed its first five-year administrative
review, sunset review, of the orders and agreements relating to
imports of hot-rolled steel from Brazil, Japan, and Russia.  The
ITC issued affirmative determinations for subject imports from all
three countries. Certain Hot-Rolled Steel Products from Brazil,
Japan, and Russia, Inv. Nos. 731-TA-384, 731-TA-806-808, USITC Pub.
3767 (Apr. 2005).

    The ITC instituted its second sunset review on April 1, 2010.
Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil,
Japan, and Russia, 75 Fed. Reg. 16504 (Int'l Trade Comm'n) (Apr. 1,
2010).  The ITC reached an affirmative determination regarding
subject imports from Russia, but reached negative determinations
with respect to subject imports from Japan and Brazil and revoked
the antidumping and countervailing duty orders previously imposed
on hot-rolled steel from those countries.  Hot-Rolled Flat-Rolled
Carbon-Quality Steel Products from Brazil, Japan, and Russia, 76
Fed. Reg. 34101 (Int'l Trade Comm'n) (June 10, 2011).

    In its findings, the ITC concluded that imports from Japan,

Brazil, and Russia were "not likely to have no discernible adverse impact" on the domestic industry in the event of revocation. <u>Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and Russia</u>, USITC Pub. 4237, Inv. Nos. 701-TA-384 and 731-TA-806-808 (June 2011) at 12-13 ("<u>Pub. Views</u>"). The ITC further found there to be a likely reasonable overlap of competition between all subject sources and between those imports and domestic like products. <u>Id.</u> at 14-15. The ITC exercised its discretion and chose not to analyze subject imports cumulatively because it deemed imports from each subject country likely to compete under different conditions in the United States market upon revocation. <u>Id.</u> at 18. The ITC distinguished the Brazilian industry as "significantly less export oriented" and noted that imports from Brazil "historically have had a much smaller and more stable presence in the United States market than imports from the other two subject countries." <u>Id.</u> at 16-17. Japanese imports displayed different pricing patterns and a much heavier focus on the Asian market than imports from Brazil or Russia. <u>Id.</u> at 17-18.

With respect to Japan, the ITC determined that the revocation of the antidumping order would not result in any significant increase in the volume of its imports to the United States. <u>Id.</u> at 44. The ITC cited the Japanese industry's consistent and overwhelming focus on Asian markets, which are larger than the United States market and projected by the ITC to grow more quickly.

Id. at 41.  The ITC also emphasized Japan's long-term relationships
with these Asian customers.  Id. at 41-42.  It noted that increases
in exports from Japan to non-Asian markets during the period of
review had been gradual.  Id. at 42.  The only export surge, during
the time of the original injury determination, was attributed to a
financial crisis that devastated demand in East Asia and remains
unlikely to recur.  Id.  Additionally, although United States
prices have typically exceeded those in other markets, the ITC
determined that the price differences were neither sufficiently,
nor consistently, large enough to provide a strong incentive for
Japanese producers to divert significant quantities of exports to
the United States from Asian markets.  Id. at 43.  Due to the
insignificant likely volume increases, as well as the lack of any
history of pervasive underselling, the ITC dismissed the likelihood
of any adverse price effects or adverse impact on the domestic
industry resulting from the revocation of the antidumping order on
Japanese imports.  Id. at 44-45.

The ITC also determined that, upon revocation of the orders
from Brazil, the subject imports were likely to be modest because
of Brazil's strong home market orientation and the related economic
incentives of directing shipments to their home market rather than
to the United States.  Id. at 38.  They also noted a "lack of any
history of import surges either to any market during the period of
review or to the United States at any time since 1996."  Id.  The

ITC dismissed the likelihood that revocation of the order on Brazil would result in "significant price-depressing and -suppressing effects," or have any significant adverse impact on the condition of the domestic industry.  <u>Id.</u> at 39-40.  The ITC also relied on its determination that the domestic industry was not vulnerable despite its recent lackluster financial performance, because demand was expected to recover as business cycle conditions improved.  <u>Id.</u> at 35.

On July 6, 2011, U.S. Steel commenced this action by filing a summons with the Court.  Their complaint, filed on August 4, 2011, alleges that the ITC's negative determinations regarding imports of hot-rolled steel from Japan and Brazil were unsupported by substantial evidence and otherwise not in accord with the law.  <u>See</u> Compl. at 8-11.  On September 26, 2011, the Court consolidated the case initiated by U.S. Steel with those initiated by AMUSA and Nucor.

**DISCUSSION**

<u>**Statutory Framework**</u>

The ITC must review antidumping and countervailing duty orders every five years.  19 U.S.C. § 1675(c)(1).  During a sunset review, the ITC "shall determine whether revocation of an order . . . is likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time.  The Commission shall consider the likely volume, price effect, and impact of imports of

the subject merchandise on the industry if the order is revoked."
19 U.S.C. § 1675a(a)(1).

## 1. Cumulation

### A. Parties' Arguments

Nucor challenges the ITC's decision not to exercise its
discretion to cumulatively analyze the effect of subject imports on
the domestic industry. Mem. in Support of Nucor's Rule 56.2 Mot.
for J. on the Agency R. at 7 ("Nucor Mem."). Nucor notes that the
ITC determined that Japan's focus on Asian markets and Brazil's
focus on its home market constituted different conditions of
competition between the producers. Nucor Mem. at 12. Nucor
characterizes their respective orientations as sales to "non-U.S.
markets," a similarity which they allege favors cumulation. Nucor
Mem. at 13. Nucor also argues that the imports from each country
should be analyzed cumulatively because the ITC found that they are
unlikely to have no discernible impact. Nucor Mem. at 16.

Defendants support the ITC's decision not to undertake a
cumulative analysis. They maintain that reliance on differences in
conditions of competition among importers from various countries is
a valid justification for the exercise of the ITC's discretion in
choosing not to cumulate under 19 U.S.C. § 1675a(a)(7). See Def.'s
Mem. in Opp'n. to Mot. of Pls. for J. on the Agency R. at 12-13
("Def.'s Mem."); Resp. of Japanese Producers in Opp'n to Pls.'
Mots. for J. on the Agency R. at 7 ("Japanese Def.'s Resp."); Resp.

of Companhia Siderurgica Nacional in Opp'n to Pls.' Mots. for J. on
the Agency R. at 19-20 ("CSN Def.'s Resp.").

Defendants add that Nucor incorrectly collapses two conditions
of competition into one. Japanese Def.'s Resp. at 8.
Specifically, they argue that Nucor conflates export orientation
and a heavy focus on Asian markets into a focus on non-United
States markets, whereas the ITC considered these factors
separately. See Japanese Def.'s Resp. at 8-9; CSN Def.'s Resp. at
15.

## B. Cumulation Analysis

When assessing imports from several countries to determine if
material injury exists, the ITC has the statutory discretion to
cumulate the volume and effect of such imports. 19 U.S.C. §
1675a(a)(7). However, "even if the subject imports meet the
statutory elements of cumulation, the ITC has discretion not to
cumulate them in a sunset review." See Nucor Corp. v. United
States, 601 F.3d 1291, 1293 (Fed. Cir. 2010). Pursuant to
statutory authority, the ITC has wide latitude in selecting the
types of factors it considers relevant in undertaking its
cumulation analysis, and in each sunset review the ITC retains its
discretion not to cumulate its analysis. See 19 U.S.C. §
1675a(a)(7).

The ITC may exercise its discretion not to cumulate imports
where it finds imports likely to operate under differing conditions

of competition.  See Nucor Corp. v. United States, 601 F.3d 1291, 1296 (Fed. Cir. 2010).  Nucor categorizes Brazil's home-market focus and Japan's Asian market focus as "sales to non-U.S. markets" in an attempt to convert what the ITC deemed a distinguishing condition of competition into a similarity which, they argue, strongly favors cumulation.

However, the ITC thoroughly examined and identified potential differences in conditions of competition relating to export orientation, historic volume trends, export market focus, and historic pricing patterns.  Pub. Views at 16-18.  Nucor's interpretation of each country's non-U.S. export focus does not, on its own, require cumulation.  The Court may not "displace the [ITC's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Therefore, the ITC's discretion not to cumulate is supported by substantial evidence and in accord with the law.

## 2. Likely Volume of Subject Imports from Japan and Brazil

### A. Parties' Arguments

Plaintiffs allege that the ITC's determination that Japan would maintain its focus on home and Asian markets and would not export to the United States in significant quantities is unsupported by substantial evidence.  Mot. of Pl. United States

Steel Corp. for J. on the Agency R., 10-11 ("U.S. Steel Mot.").
They allege that Japanese producers have the ability, substantial
export orientation (due to a weak home market), and excess capacity
to significantly increase exports to the United States  Id. at 10.
Plaintiffs further claim that the ITC has presented insufficient
evidence that the Asian market will be able to absorb Japan's
excess capacity and note that Asian production is exceeding
consumption.  Id. at 10, 20.  Plaintiffs also contest the ITC's
determination that Japanese producers will maintain their focus on
Asian markets after revocation because of their long-term
relationships with Asian customers.  Id. at 13-15.

     Additionally, U.S. Steel argues that the ITC's findings were
predicated on erroneous projections that steel consumption in Asia
would continue to grow.  Id. at 20-21.  Japanese producers' export
history to Latin America, they allege, indicated a high likelihood
that these producers would shift exports to the more attractive
United States market upon revocation.  Id. at 24.  AMUSA adds that
the Japanese industry's moderate growth in non-Asian markets is not
evidence that imports to the United States will be moderate, since
the United States market is more comparable to a region like Asia
and has historically higher prices than Latin America.
ArcelorMittal USA's Mem. of Law in Support of Mot. for J. on the
Agency R., 20-21, ("AMUSA Mem.").   Nucor adds that Japanese

producers were targeting new export markets outside of Asia not gradually but suddenly and aggressively. Nucor Mem. at 31.

With respect to Brazil, Nucor argues that revocation will result in dumping because Brazilian production capacity was imminently projected to increase beyond demand growth and Brazilian producers consistently undersold a portion of their production during the period of review. Id. at 33.

Defendants characterize Plaintiffs' challenges as mere attempts to relitigate contested factual issues that have already been appropriately decided by the ITC. Defendants allege that the ITC provided substantial evidence to support its projection that Japanese producers remain likely to focus predominantly on Asian export markets because the ITC specifically referenced that Asian consumption has exceeded that of North America and is also projected to grow rapidly. Def.'s Mem at 18. Defendants also note that the ITC justifiably relied on Japan's significant long-term commercial relationships within Asia because the ITC is "not required to find the existence of 'binding contracts' as a predicate to determining that the agreements and relationships in question would continue to be the strategic focus." Japanese Def.'s Resp. at 15. Moreover, they argue that these relationships are "significant investments," "pervasive and central" to the Japanese industry, and the ITC's judgment regarding the weight given to them as evidence of market focus should not be

second-guessed by the Court.  Japanese Def.'s Resp. at 15-17.
Lastly, Defendants note that Asian demand is stronger today than it
was in 1998, which increases the likelihood of Japan's continued
focus on exports to Asia.  Def.'s Mem. at 19.

Defendants do not believe that Japan's excess capacity will
result in increased exports to the United States upon revocation.
See Japanese Def.'s Resp. at 22.  They argue that Plaintiffs have
erroneously assumed that Japanese producers will prioritize full
capacity utilization regardless of market conditions, and that the
mere existence of unused capacity is equivalent to an increased
likelihood that such excess will be used to increase shipments to
the United States.  Id. at 23-24.  Defendants note that the ITC
never found that Asia would absorb all Japanese capacity nor that
Japan would likely operate at full capacity.  Def.'s Mem. at 20.
Historically, increases in Asian production and excess capacity
have not displaced Japanese exports from Asian markets, even when
those markets have continued to grow.  Japanese Def.'s Resp. at 26.

Defendants further allege that Plaintiffs fail to show a
significant and consistent history of price discrepancies favoring
the United States market.  See id. at 27-28.  While conceding that
United States prices have at times been higher than those of
Japan's or other Asian markets, defendants argue that prices have
not been higher with enough consistency to increase the likelihood
that Japanese producers would shift their export focus to a

significant extent.  Def.'s Mem. at 28-29.  Since Japanese
producers have not demonstrated a pattern of sudden export
shifting, the price differential between American and Japanese
markets would have to be considerably greater than the differential
recorded during the period of review in order to incentivize a
significant export shift to the United States.  Id.  As such,
defendants argue the relative attractiveness of United States
prices would not necessarily result in significant increases of
subject imports from Japan.  Id.

Defendants also address Plaintiffs' analogies to Latin
American markets in order to discredit Plaintiffs' increased volume
projections.  Def.'s Mem. at 19; Japanese Def.'s Resp. at 29.
Defendants emphasize the reasonableness of the ITC's finding that
Japanese producers have exhibited no recent propensity to move
significant import volumes from less attractive to more attractive
export markets.  Def.'s Mem. at 19; Japanese Def.'s Resp. at 29.
Defendants also note that the ITC found that not all markets in
Latin America were less attractive than the United States market.
Def.'s Mem. at 27.  Additionally, Defendants support the ITC's
dismissal of these comparisons on the grounds that Plaintiffs cite
to an undefined and vast region described as "Latin America" and
give no evidence of that region's common conditions of competition.
Id. at 26-27.  Defendants support the ITC's statutory discretion to

use evidence of historical export shifting trends rather than Plaintiffs' data relating to absolute volumes. <u>Id.</u> at 29.

With respect to Brazil, Defendants dispute Nucor's demand projections in that they neglect to account for the temporarily diminished capacity of up-start steel mills opening in Brazil. Def.'s Mem. at 39; CSN Def.'s Resp. at 35. Defendants also support the ITC's reliance on factors weighing against increased volume projections, including Brazil's home market orientation, strong local demand, and historically stable export behavior. Def.'s Mem. at 37-38; CSN Def.'s Resp. at 35-37.

## B.  Volume Analysis

The ITC provided substantial evidence in support of its findings, with respect to global projections for production and consumption, as well as each country's export orientation, pricing trends, and market focus. <u>See</u> <u>Pub. Views</u> at 36-38, 40-43. The ITC emphasized Japan's overwhelming export focus on the Asian market, which is already the world's largest market and is experiencing robust and continuing growth. <u>Id.</u> at 41. In addition to its emphasis on that market's "size, projected dynamic growth, and proximity to Japan", the ITC analyzed Japanese producers' long-term relationships in the region, growth in exports to the region during the period of review, lack of sudden export shifting or product shifting, as well as significant changes in conditions of competition that transpired during the period of review. <u>Pub.</u>

Views at 41-42. Most notably, Asian demand has increased significantly since the financial crisis that occurred during the time of the original injury determination. Id. at 42. Although Asian production has increased in kind, there has been no history of displacement of Japanese imports to such markets. Id. at 42 n.263. Additionally, the ITC reviewed world market prices and determined that prices in the United States were not consistently higher and provided insufficient motivation for Japan to shift its export orientation. Id. at 43.

Regarding the likelihood of import volume increases from Brazil, the ITC first noted that Brazilian producers directed at least 87.9% of shipments to the home market during each year of the period of review. Id. at 37. In 2010, the last year of the period of review, the home market absorbed 92.7% of the industry's capacity. Id. The ITC next noted that steel prices were consistently and often substantially higher in Brazil than in North America, and that steel consumption is projected to increase in Brazil. Id. The ITC also analyzed Brazil's inventories, history of shipments to different export markets, and potential product shifting, and found the industry unlikely to increase a significant volume of subject imports to the United States upon revocation. Id. at 37-38.

As long as there is "adequate basis in support of the Commission's choice of evidentiary weight, [the Court], reviewing under the substantial evidence standard must defer to the Commission." <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1359 (Fed. Cir. 2006). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." <u>Air Prods. & Chems., Inc. v. United States</u>, 22 CIT 433, 442, 14 F. Supp. 2d 737, 746 (1998) (quoting <u>Timken Co. v. United States</u>, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), <u>aff'd</u> 894 F.2d 385 (Fed. Cir. 1990)). The Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." <u>Altx, Inc. v. United States</u>, 370 F.3d 1108, 1121 (Fed. Cir. 2004) (internal quotations omitted). Here, the ITC acted within its discretion to determine which data to rely upon. Furthermore, the ITC reasonably explained its conclusions regarding likely volume imports and pointed to substantial record evidence in support of each. <u>Pub. Views</u> at 36-38, 40-43. As such, the ITC's determinations regarding likely import volumes from Japan and Brazil were both supported by substantial evidence and otherwise in accord with the law.

## 3. Likelihood of Price Effects

## A. Parties' Arguments

Plaintiffs allege that the ITC's price effects determinations are flawed because they are predicated on faulty volume determinations. Nucor Mem. at 38. AMUSA alleges that the price effects determination for Japan was erroneous because it compared products of mismatched price and quality. AMUSA Mem. at 28. Nucor adds that "pernicious price effects" can stem from a mixture of overselling and underselling. Nucor Mem. at 37. They dispute the ITC's position that underselling by Japanese producers must be pervasive in order to cause significant adverse price effects. Id. Nucor alleges that Brazil has the ability to undersell in the United States by considerable margins. Id. at 39.

Defendants support the ITC's findings that imports from Japan and Brazil are unlikely to result in any significant price effects. Def.'s Mem. at 30, 39. Defendants concur with the ITC's findings that insignificant volume increases were based on substantial evidence. Id. at 30-31, 39. Defendants emphasize that the legal standard only requires consideration of "significant price underselling" and "significant depressing or suppressing effect[s]" on domestic prices, and that the ITC need not consider the possible effects of mixed overselling and underselling. Japanese Def.'s Resp. at 33; see also 19 U.S.C. §§ 1675a(a)(3)(A)-(B). Defendants allege that the ITC reasonably relied on all available data. Japanese Def.'s Resp. at 33; Def.'s Mem. at 31. The statute only requires the ITC to consider pricing data for United States imports

and not pricing data for Japanese producers' import activities in other countries. Japanese Def.'s Resp. at 33; Def.'s Mem. at 31. Lastly, Defendants dismiss Plaintiffs' arguments regarding product mismatching as non-dispositive, given that the product comparison represented only a portion of the ITC's pricing analysis. Japanese Def.'s Resp. at 32-33. The ITC also examined historic pricing patterns and found no consistent underselling. Def.'s Mem. at 31.

B. Price Effects Analysis

Plaintiffs contend that the ITC's pricing determinations are flawed because of their reliance on the related volume determinations. However, the Court concluded above that the ITC's volume determinations were supported by substantial evidence. Therefore, this argument is moot.

Additionally, AMUSA's mismatching argument does not warrant remand because the ITC's analysis of potential underselling was broad-based. The ITC analyzed both historic and likely pricing trends in addition to the product comparison to which AMUSA objects. See Pub. Views at 44; see also 19 U.S.C. § 1675a(a)(3).

The ITC's assessments of the pricing evidence with respect to imports from Japan and Brazil are reasonable and adequately explained. Pub. Views at 39, 44. The ITC specifically discussed its conclusions regarding insignificant price effects with reference to data reflecting insignificant underselling during the original period of investigation. Id. at 39, 44-45. The ITC

distinguished between present market conditions in the related countries and those existing at the time of the original injury investigation. Id. Here, the evaluation of the evidence is more than mere conjecture and the ITC's "decision is reasonably discernible to the Court." NMB Singapore Ltd. v. United States, 557 F.3d. 1316, 1319-20 (Fed. Cir. 2009). Therefore, the ITC's pricing determination was supported by substantial evidence and otherwise in accord with the law.

## 4. Vulnerability of the Domestic Industry

### A. Parties' Arguments

Plaintiffs argue that the ITC's vulnerability analysis was flawed because it only discussed the industry's financial performance. U.S. Steel Mot. at 29. They allege that the ITC failed to consider other impact factors such as employment conditions, production, shipments, capacity utilization, and growth. U.S. Steel Mot. at 29-30; AMUSA Mem. at 37. Plaintiffs also contest the ITC's assessment of the relationship between weak demand and industry vulnerability. U.S. Steel Mot. at 33; AMUSA Mem. at 35. They argue that the ITC should have treated weak demand as a strong indicator of industry vulnerability. U.S. Steel Mot. at 36; AMUSA Mem. at 35. AMUSA adds that the ITC failed to explain its finding with reference to the original injury determinations and the relative trade and financial conditions of 1998. AMUSA Mem. at 38. In addition, Nucor emphasizes that the

ITC's failure to address evidence from industry questionnaires severely undermines its conclusion that United States demand was likely to improve.  Nucor Mem. at 20.

Defendants rebut Plaintiffs' contentions that the ITC's assessment focused exclusively on financial performance with reference to the ITC's discussion of "other factors" including employment, wages, and productivity within its analysis of the Russian suspension agreement.  Def.'s Mem. at 33; Japanese Def.'s Resp. at  36; CSN Def.'s Resp. at 30.  They also argue that the ITC's determinations would not be presumptively invalid even if they considered only financial performance.  CSN Def.'s Resp. at 31.  Defendants further argue that the ITC did not equate weak demand with lack of vulnerability, and that the "lackluster" performance of the domestic industry reflected demand conditions in the context of the business cycle rather than structural vulnerabilities of the industry itself.  Def.'s Mem. at 33-34.  Furthermore, defendants maintain that the restructured domestic industry was healthier during the second sunset review than during the original injury determination.  Japanese Def.'s Resp. at 38.  Defendants also note that the domestic industry is poised to grow in tandem with projected United States demand increases in the foreseeable future.  Japanese Def.'s Resp. at 38; CSN Def.'s Resp. at 33.

B. Vulnerability Analysis

The ITC explained its interpretation that the lackluster performance of the domestic industry reflected demand conditions in the context of the business cycle rather than structural vulnerabilities of the industry itself. <u>Pub. Views</u> at 26-27. The ITC provided substantial evidence that steel demand has been historically tied to broad demand trends in the national economy, and that the industry is poised to experience a recovery with projected increases in demand. <u>Id.</u> "[W]hen the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the [ITC] . . . to decide which . . . evidence to believe." <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1359 (Fed. Cir. 2006).

The ITC also relied on projections of increased demand. They contrasted this demand with the demand of the original injury determination during which unique market conditions existed due to the Asian financial crisis. <u>Pub. Views</u> at 44. The vulnerability determination did not conflict with the original injury determination because the ITC considered changes in market conditions and projections for increased demand. The ITC also considered industry factors beyond those strictly related to financial performance. For example, the ITC's discussion of revocation of the suspension agreement with Russia considered "other factors" such as employment, wages, and productivity, and

was incorporated by reference into the ITC's discussion of revocation for Japan and Brazil.  Id. at 34.

The ITC is "not required to explicitly address every piece of evidence presented by the parties" during a sunset review.  See, e.g., Nucor Corp. v. United States, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004), aff'd 414 F.3d 1331 (Fed. Cir. 2005).  As long as "there is adequate basis in support of the Commission's choice of evidentiary weight, [this Court], reviewing under the substantial evidence standard, must defer to the Commission."  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed. Cir. 2006).  Such adequate basis was provided here in the ITC's views.  Therefore, the ITC's vulnerability analysis was supported by substantial evidence and in accord with the law.

## 5. Likelihood of Adverse Impact

### A. Parties' Arguments

Plaintiffs contend that the ITC's impact determinations are flawed because they relied on faulty volume, pricing, and vulnerability determinations.  AMUSA Mem. at 39-40; Nucor Mem. at 39.  Defendants believe that the volume and pricing determinations were reasonable.  Def.'s Mem. at 32, 40.

### B. Analysis

Plaintiffs' objections to the ITC's impact determinations are entirely predicated on their objections to the ITC's volume, pricing, and vulnerability analyses.  However, the volume, pricing,

and vulnerability determinations are supported by substantial evidence and in accord with the law. "[Given that] the Court has already sustained the Commission's volume and price effects analyses, . . . the Court finds that the likely impact analysis is supported by substantial evidence and is otherwise in accordance with law." <u>Nucor Corp. v. United States</u>, __ CIT __, 675 F.Supp.2d 1340, 1363 (2010). Therefore, reliance on these determinations to support an adverse impact analysis gives Plaintiffs no support for their argument.

**CONCLUSION**

In accordance with the foregoing, Plaintiffs' motion for judgment on the agency record is denied, and this matter is dismissed.

 /s/ NICHOLAS TSOUCALAS 
**Nicholas Tsoucalas**
**Senior Judge**

Dated: August 14, 2012
       New York, New York

Slip Op. 12-108

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Nicholas Tsoucalas, Senior Judge**

---

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | : |
| and | : |
| | : |
| NUCOR CORPORATION and ARCELORMITTAL | : |
| USA LLC, | : |
| Plaintiff-Intervenors | : |
| | : |
| v. | :Consol. Court No. 11-00228 |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| COMPANHIA SIDERURGICA NACIONAL, JFE | : |
| STEEL CORPORATION, KOBE STEEL, LTD., | : |
| NIPPON STEEL CORPORATION, NISSHIN | : |
| STEEL CO., LTD., and SUMITOMO METAL | : |
| INDUSTRIES, LTD., | : |
| | : |
| Defendant-Intervenors. | : |

---

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein, now, in accordance with said decision, it is hereby

**ORDERED** that Plaintiffs' Motions for Judgment on the Agency Record are denied; and it is further

**ORDERED** that this matter is dismissed.


                                         /s/ NICHOLAS TSOUCALAS
                                        **Nicholas Tsoucalas**
                                         **Senior Judge**


Dated: August 14, 2012
       New York, New York

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure,

the undersigned counsel for Plaintiff-Appellant United States Steel Corporation

certifies that this brief contains 6649 words.  This word count certification is made

in reliance on the word count feature of Microsoft Word.


/s/ James C. Hecht
James C. Hecht
Counsel to Plaintiff-Appellant
United States Steel Corporation

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7370
Facsimile: (202) 661-9080
E-Mail: InternationalTrade@skadden.com

December 18, 2012

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

<u>United States Steel Corporation v. United States</u>

**No. 2012-1695, 2013-1020**

**PUBLIC CERTIFICATE OF SERVICE**

I hereby certify that on <u>December 18</u>, <u>2012</u>, I caused service of the foregoing document by electronic filing using the CM/ECF System, which will send a Notice of Docketing Activity to all parties with an email address of record:

Marc A. Bernstein, Esq.
**U.S. INTERNATIONAL TRADE
  COMMISSION**
Room 707M
500 E Street, S.W.
Washington, D.C. 20436

Carrie Anna Dunsmore, Esq.
**U.S. DEPARTMENT OF JUSTICE
  COMMERCIAL LITIGATION
  BRANCH – CIVIL DIVISION**
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

*On behalf of United State*s

Craig A. Lewis, Esq.
**HOGAN LOVELLS US LLP**
555 13th Street, N.W.
Washington, D.C. 20004

*On behalf of Companhia Siderurgica
Nacional*

J. Christopher Wood, Esq.
**GIBSON DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

*On behalf of JFE Steel Corp., Kobe Steel,
Ltd., Nippon Steel Corporation, Nisshin
Steel Co., Ltd., and Sumitomo Metal
Industries, Ltd.*

Alan H. Price, Esq.
**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006

*On behalf of Nucor Corporation*

　　　　　/s/ James C. Hecht
By:     James C. Hecht

Skadden, Arps, Slate, Meagher
 & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005-2111
Tel: (202) 371-7370
Fax: (202) 661-9080
InternationalTrade@skadden.com